UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DANNETTE L.[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 3:21-cv-00281-GCS |
| | ) |
| COMMISSIONER of SOCIAL SECURITY, | ) |
| | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM & ORDER**

**SISON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff, through counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. § 423.[2]

PROCEDURAL HISTORY

Plaintiff applied for DIB on November 19, 2018, alleging a disability onset date of February 21, 2018. After holding a telephone evidentiary hearing on September 8, 2020, an Administrative Law Judge ("ALJ") denied the application on December 16, 2020. (Tr. 15-27). On January 11, 2021, the Appeals Council denied Plaintiff's request for review,

---

[1]    Plaintiff's full name will not be used in this Memorandum & Order due to privacy concerns. *See* FED. R. CIV. PROC. 5.2(c) and the Advisory Committee Notes thereto.

[2]    This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). *See* (Doc. 9).

making the ALJ's ruling the final agency decision subject to judicial review. (Tr. 1-6). Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issues:

1. Fibromyalgia is a severe, medically determinable impairment.

2. The ALJ erred by inferring limitations from medical imaging and raw medical findings.

3. The decision lacks a proper evaluation of Plaintiff's pain and subjective symptoms.

## APPLICABLE LEGAL STANDARDS

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20

C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *See Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential,

it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## THE DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above. She determined that Plaintiff had not worked at the level of substantial gainful activity during the period from her alleged onset date of February 21, 2018 through her last insured date of June 30, 2020. The ALJ found that Plaintiff had the following severe impairments of interstitial lung disease; tobacco abuse; missed connective tissue disease and Sjogren's syndrome; generalized anxiety disorder/panic disorder; depressive disorder; left foot osteoarthritis; and degenerative disc disease of the lumbar spine. (Tr. 18). Plaintiff also had the following non-severe impairments of hypothyroidism; somatic system disorder; chronic sinusitis, and opioid use disorder. *Id.* Further, the ALJ found that the record "contains no objective medical evidence to substantiate the claimant's allegations that fibromyalgia is a medically determinable impairment." *Id.*

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that she could not climb ladders, ropes, or scaffolds and was limited to occasional climbing of ramps and stairs. The Plaintiff could engage in occasional stooping, kneeling, crouching, and crawling and could perform frequent handling/fingering. She could not work at unprotected heights, around moving mechanical parts or other such hazards, and she

could not have concentrated exposure to extreme heat, cold, humidity, wetness, dust, fumes, or other pulmonary irritants. The Plaintiff was limited to performing simple routine tasks and could perform work with production expectations, but the work could not be at a fast pace such as an assembly line, where other work functions would be dependent on her completion of a task. She was limited to work that required only occasional changes in the work setting, and she could have occasional interaction with co-workers, supervisors, and the public. (Tr. 20-21). Based on the testimony of the vocational expert ("VE"), the ALJ found that Plaintiff could not do past relevant work as an employment or personnel clerk. (Tr. 26). However, also based on the VE's testimony, the ALJ found that, through the date last insured, the Plaintiff was capable of making a successful adjustment to do other work such as hand packer, production worker, and inspector/tester/sorter, all sedentary jobs that existed in significant numbers in the national economy. (Tr. 27). Thus, the ALJ found Plaintiff was not disabled at any time from February 21, 2018 through June 30, 2020. *Id.*

### THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum & Order. The following summary of the record is directed to the first issue raised by Plaintiff.

**1.    Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing on February 13, 2020. (Tr.

23). During the hearing, Plaintiff and the VE, Dr. Darrell W. Taylor, PhD, testified.

Plaintiff testified that her pain was in the palms of her hands, fingers, wrists, lower and middle back, ankles, and the bottom of her feet. The pain in her hands and fingers was constant and produced a tingling sensation. (Tr. 44-45). Her doctor told her that the pain was a symptom of the lupus and fibromyalgia. The pain made it hard to grip things and to use a keyboard. Her husband opened jars and lids for her. She could write for short periods of time, such as a paragraph. (Tr. 45). Plaintiff further testified that she had joint pain in her wrists when she bent them. The pain in her lower and middle back felt like it was on fire, and sometimes she could not stand up because of the pain. (Tr. 47). This pain was located on the lower part of her spine and right in the very middle of her back. (Tr. 47). She could stand 10 minutes before she had to sit down for 10 to 15 minutes, then she would be able to stand again. Standing in one specific spot was harder than walking. (Tr. 48). She could also walk 10 to 15 yards before she experienced pain.

Plaintiff further testified that her ankles and feet swelled every day. (Tr. 48). They would swell if she was on her feet a lot, and sometimes when she woke up her feet would be swollen. (Tr. 49). Her doctor told her that there could be a variety of reasons why her feet would swell, including, among other things, her autoimmune problem, her medication, or her circulation. Taking water pills and elevating her feet in a recliner would help reduce the swelling. (Tr. 49). Plaintiff testified that she was in the recliner elevating her feet for the majority of the day. (Tr. 50).

Because of her interstitial lung disease, Plaintiff was short of breath. For example, going to the mailbox and showering would make her short of breath. She could also not go up or down the stairs or do laundry. (Tr. 50). Plaintiff took a long-term medication for her lung issue. She was also prescribed a new medication which caused her to lose a significant amount of weight as it affected her digestive system. (Tr. 51).

Plaintiff also testified that her short-term memory was "very scattered", and her ability to articulate her thoughts was a problem (Tr. 51, 52). Further, Plaintiff did not sleep well; she would get three to four hours at a time. (Tr. 52). Plaintiff also had anxiety that made her have panic attacks, which included shortness of breath, a feeling of hotness, and a feeling as if a boulder was on her chest. She experienced panic attacks three to four times a week. (Tr. 53). If she took her medication right away, she could get the panic attack under control in about 20 minutes. (Tr. 53). If she was unable to take her medication, it took her about an hour and a half to get the panic attack under control. Plaintiff also had trouble concentrating, which made it hard for her to start or complete tasks. (Tr. 54).

Plaintiff testified that her prior work included being an HR assistant and an HR generalist. (Tr. 42-43).

Dr. Taylor, the VE, also testified. Dr. Taylor classified Plaintiff's past work as an employment clerk, which is sedentary and skilled and as a personnel clerk, which is sedentary and semi-skilled. (Tr. 56). Dr. Taylor testified that a hypothetical individual,

who was the same age as Plaintiff and had the same education and past work consistent with what was described for the Plaintiff, could not perform the Plaintiff's past work. (Tr. 58). Dr. Taylor noted, however, that this hypothetical individual could perform other jobs. (Tr. 58). Specifically, such an individual could work as a hand packer, production worker, or inspector tester sorter (all unskilled, sedentary), and such jobs did exist in significant numbers in the national economy. (Tr. 59). Nevertheless, Dr. Taylor testified that competitive work did not exist if an individual was limited to occasional handling and fingering. (Tr. 59). Similarly, Dr. Taylor testified that competitive work did not exist if an individual had to alternate sitting with standing and walking every ten minutes. (Tr. 59). Dr. Taylor further testified that competitive work did not exist if an individual was off task 20 percent of the workday or if the individual was absent two or more days per month. (Tr. 60).

**2.      Relevant Medical Records**

    **a.      Dr. Steven Baak**

On August 17, 2018, Plaintiff treated with rheumatologist Dr. Steven Baak for mixed connective tissue disease and fibromyalgia. Plaintiff reported fatigue, insomnia, and moderate joint pain in her lower back, bilateral MCP joints, bilateral PIP joints, and bilateral feet. (Tr. 311). On exam, Plaintiff had diffuse crackles on auscultation of the lungs; Plaintiff's spine was tender to palpitation, and she had more than 10 trigger points. (Tr. 314, 315). Dr. Baak diagnosed Plaintiff with fibromyalgia. (Tr. 315). Also, Dr. Baak

ordered numerous tests: cardiolipin antibody panel, thyroid peroxidase antibody assay, immunoglobulin A measurement, rheumatoid factor, urinalysis, Hepatitis C antibody assay, ANA comprehensive reflex SNA/ENA, creatine kinase, CRP, sedimentation rate, and aldolase. (Tr. 315-316). Dr. Baak prescribed Tylenol 1000mg 3 times a day, Gabapentin 600-1200 mg nightly, Hydroxychloroquine 400 mg daily. (Tr. 316).

On September 5, 2018, Plaintiff returned to Dr. Baak with complaints of mild rash, fatigue, muscle pains, joint swelling, mid-lower back pain, bilateral MCP joint pain, bilateral PIP joint pain, right wrist pain, bilateral ankles, and bilateral feet. She also reported complaints of coughing, headaches, insomnia, paresthesia, shortness of breath, and a worsening memory. (Tr. 323). Plaintiff additionally reported that the symptoms had waxed and waned over the last several months. Examination of Plaintiff revealed reduced breath sounds in the base on auscultation of lungs and decreased moisture present in the conjunctivae, swollen wrist, decreased light touch sensation in the feet, tenderness to palpation in the thoracic and lumbar spine regions, swelling in both ankles, and greater than 10 trigger points. (Tr. 325, 326). Dr. Baak assessed Plaintiff *inter alia* with fibromyalgia, systemic lupus erythematosus ("SLE") and lupus cerebritis. (Tr. 326). Dr. Baak prescribed Cellcept. (Tr. 327). The bloodwork ordered by Dr. Baak also revealed that Plaintiff was positive for ANA with Smith antibody and a positive DNA assay. (Tr. 329).

A little over a month later, on October 11, 2018, Plaintiff again treated with Dr. Baak. She reported a mild rash, fatigue, muscle pains, joint pain, swelling in the mid-

lower back, bilateral MCP joints, bilateral PIP joints, right wrist, bilateral ankles, and bilateral feet. Additionally, she complained of a cough, headaches, insomnia, paresthesia, shortness of breath, and memory problems. Dr. Baak noted that Plaintiff had reduced breath sounds in the base on auscultation of lungs, a swollen wrist, decreased light touch sensation in the feet, tenderness to palpitation in the thoracic and lumbar spine, swelling in the bilateral ankles, and greater than 10 trigger points. (Tr. 320).

On February 11, 2019, Plaintiff saw Dr. Baak for a worsening of her fatigue and muscle pains. (Tr. 608). She also complained of joint pain, as well as swelling in her mid-lower back, bilateral MCP joints, bilateral PIP joints, right wrist, bilateral ankles and bilateral feet, shortness of breath, and memory problems. (Tr. 608). Dr. Baak noted that she had dry eyes, reduced breath sounds in the base of her lungs, a tender wrist, decreased sensation in the feet, tenderness to palpation in the thoracic lumbar spine, swelling in the bilateral ankles, decreased sensation in the feet, and greater than 10 trigger points. (Tr. 611). Dr. Baak increased Cellcept to 500 mg 2 times a day. (Tr. 612). Again, Dr. Baak assessed Plaintiff with fibromyalgia. (Tr. 611).

On May 5, 2019, Plaintiff returned to Dr. Baak for a follow-up visit. Plaintiff reported fatigue, muscle pains, joint pain, and swelling in the mid-lower back, bilateral MCP joints, bilateral PIP joints, right wrist, bilateral ankles, and bilateral feet. (Tr. 603). After examination, Dr. Baak noted dry mouth, dry eyes, a tender wrist, reduced breath sounds in the base of the lungs, decreased sensation in the feet, tenderness to lumbar and

thoracic spine, poor concentration, decreased fund of knowledge, and greater than 10 trigger points. (Tr. 605-606). Dr. Baak adjusted her medications and again assessed Plaintiff with fibromyalgia. (Tr. 606, 607).

Approximately six months later, Plaintiff saw Dr. Baak again. She reported moderate fatigue, muscle pains, and pain and swelling in the joints. (Tr. 632). Dr. Baak increased Cellcept to 1500 mg (Tr. 632). Dr. Baak indicated that her breathing was unlabored, but with reduced breath sounds in the lung base, tenderness in the bilateral wrists, tenderness and swelling in the bilateral fingers, decreased sensation in the feet, poor concentration, and poor fund of knowledge with greater than 10 trigger points. (Tr. 634-635). Dr. Baak prescribed Prednisone 5 mg and adjusted her other medications. (Tr. 635-636). Dr. Baal assessed her with fibromyalgia. (Tr. 635).

On January 21, 2020, Plaintiff saw Dr. Baak for ILD, lupus and insomnia. She reported moderate joint pain and swelling, fatigue, and muscle pains. As before, Plaintiff had pain in her mid-lower back, bilateral MCP and PIP joints, right wrist, bilateral ankles, and bilateral feet. Dr. Baak prescribed Tramadol and Tylenol for the pain. (Tr. 596). Dr. Baak reported reduced breath sounds in the base of the lungs, decreased sensation in the feet, tenderness to palpitation in the thoracic and lumbar back, poor concentration, and an abnormal fund of knowledge with greater than 10 trigger points. (Tr. 598-599). Dr. Baak assessed continued lupus erythematosus with lung involvement, lupus cerebritis, and fibromyalgia. (Tr. 599). The X-ray results of the thoracic spine Dr. Baak ordered

showed multilevel degenerative disc loss of disc space height, and the indication stated "Back pain fibromyalgia." (Tr. 591).

Six months later, Plaintiff visited Dr. Baak for a follow-up for worsening SLE and ILD. She complained of joint and muscle pain in the mid-lower back and bilateral feet, fatigue, headaches, insomnia and paresthesia in the bilateral hands and feet, swelling in the bilateral feet that was better in the evening with elevation, and poor memory. (Tr. 620). After examination, Dr. Baak noted reduced breath sounds in the lung base, tenderness in both wrists, decreased sensation in the feet, tenderness to palpitation in the thoracic and lumbar spine, poor concentration, a lack of awareness of current events, and greater than 10 trigger points. (Tr. 622-623). Dr. Baak assessed Plaintiff with fibromyalgia. (Tr. 623).

About a month later in August 2020, Dr. Baak completed a residual functional capacity questionnaire regarding Plaintiff's physical health symptoms and her ability to function in the workplace. Dr. Baak identified her objective signs: discoid rash of the scalp, photosensitivity, non-erosive arthritis of the wrists, feet, and lumbar spine. (Tr. 660-661). Dr. Baak identified her symptoms which included: constipation, severe fatigue, severe malaise, muscle weakness, frequent and persistent infections, poor sleep, migraines, impaired vision, hair loss, impaired muscle coordination and Sjogren's syndrome. (Tr. 661). As to concentration and attention, Dr. Baak opined that Plaintiff's symptoms were severe enough to interfere with her ability to focus and concentrate

"constantly." He further opined that even "low stress" jobs were too much because of her continuous need for assistance with activities of daily living. Plaintiff could only walk around one city block, sit for 15 minutes, or stand for 5 minutes at a time without a break. (Tr. 662). In an 8 hour work day, Dr. Baak opined that Plaintiff could sit, stand, or walk less than 2 hours total. He also opined that she would need a job that allowed her to shift positions "at will" and to take unscheduled breaks to lie down or sit quietly every 30 minutes for 10 minutes. He also noted that she could occasionally lift up to 10 pounds and never more than that; that she could occasionally twist, scoop or crouch but that she could never climb ladders or stairs. (Tr. 663). As to the use of her hands, fingers and arms, Dr. Baak found that Plaintiff could only use her hands to grasp/turn/twist objects, her fingers for fine manipulations, and her arms for reaching 5% for an 8 hour work day. He also found that she must avoid concentrated exposures to perfumes, moderate exposures to extreme cold and heat, and all exposure to high humidity, fumes, cigarette smoke, soldering fluxes, solvents/cleaners and chemicals and that she would be absent from work more than 4 days a month due to her impairments or the treatment of such. (Tr. 664).

    b.    **Dr. Anneliese Flynn**

In late November 2018, Plaintiff saw rheumatologist Dr. Anneliese Flynn for a second opinion regarding the Interstitial Lung Disease diagnosis. Dr. Flynn's examination found bibasilar crackles in the lungs and that Plaintiff was alert and oriented

to place and time, with strength 5/5 in all extremities. (Tr. 345-346). Dr. Flynn concurred with the diagnosis of Sjogren's syndrome and ordered a CT scan of the chest to evaluate the connective tissue disorder diagnosis. (Tr. 347). The CT of the chest showed mild reticulation and scarring at the lung bases with mild scarring in the lung apices. (Tr. 349). Dr. Flynn also ordered X-rays of the bilateral hands and feet. The X-rays showed an os navicular, os trigonum and os peroneus in the right foot; it also showed bipartite os navicular and a small os peroneus with evidence of mild first metatarsophalangeal joint osteoarthritis in the left foot. Also, the X-rays showed moderate first carpometacarpal joint osteoarthritis of both hands. (Tr. 348).

On February 11, 2019, Plaintiff followed up with Dr. Flynn for Sjogren's syndrome symptoms, unchanged dyspnea, and a 15–20-pound weight loss. Dr. Flynn's examination revealed bibasilar crackles in the lungs, lower extremity swelling bilaterally, and notable for + R hearing loss. (Tr. 400, 402).

  c. **Washington University Pulmonary Care Clinic**

On March 1, 2019, Plaintiff treated with the Washington University Pulmonary Care Clinic ("Clinic") for shortness of breath with exertion that limited her ability to complete her daily activities. (Tr. 418). An examination of Plaintiff revealed crackling in the bilateral lung fields without wheezing or decreased breath sounds and mild bilateral ankle swelling. (Tr. 421). Dr. Schiffer reviewed the spirometry testing and diagnosed an impairment of the alveolar gas exchange by DLCO. (Tr. 421). Because Plaintiff had the

presence of mild to honeycombing, her MMF was titrated from 1000 mg BID to Maximum 1500 mg BID. (Tr. 422).

On September 20, 2019, Plaintiff followed up with the Clinic. She reported no worsening symptoms, cough, or other respiratory issues. However, Plaintiff had shortness of breath after going up more than one flight of stairs. (Tr. 511). A CT exam was ordered, and it was recommended that Plaintiff restart Cellcept and follow up with the internal rheumatology team. (Tr. 512).

In July 2020, Plaintiff followed up again with the Clinic. She reported her breathing was more labored with significant exertion, such as when she was doing yard work or housework. (Tr. 517). Her echocardiogram showed no evidence of pulmonary hypertension. (Tr. 518).

### d.    State Agency Consultants' Opinions

On June 4, 2019, and on October 23, 2019, two state agency medical consultants assessed Plaintiff's RFC based on a review of the record. Dr. Lenore Gonzalez opined that Plaintiff could perform work at the light exertional level and that Plaintiff was not disabled. (Tr. 74-78). On reconsideration, Dr. Marion Panepinto agreed with Dr. Gonzalez's opinion and found that Plaintiff was not disabled. (Tr. 91-95). In rendering their decisions, both doctors noted that Plaintiff had greater than ten trigger points and that Plaintiff was diagnosed with fibromyalgia. (Tr. 74, 91).

ANALYSIS

The Court agrees that the ALJ did not adequately explain her assessment that Plaintiff's fibromyalgia is not a medically determinable impairment. Based on the foregoing, the Court finds that remand is required for a proper evaluation.[3]

Fibromyalgia is "a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features . . . . Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). The principal symptoms of fibromyalgia are "pain all over," fatigue, disturbed sleep, stiffness, and multiple tender points. *Id.* The extent of fibromyalgia pain cannot be measured with objective tests aside from a trigger-point assessment. *See Vanprooyen v. Berryhill*, 864 F.3d 567, 568 (7th Cir. 2017).

On July 25, 2012, the SSA issued SSR 12-2p entitled "Title II and XVI: Evaluation of Fibromyalgia" for guidance on how an impairment of fibromyalgia can be identified and how it should be evaluated. SSR 12-2p, 2012 WL 3104869, at *1 (July 25, 2012). This Ruling describes the evidence needed to establish fibromyalgia as a medically determinable impairment under the regulations. Specifically, SSR 12-2p

---

[3] As the Court finds that the ALJ committed error regarding Plaintiff's allegations regarding fibromyalgia which requires remand, the Court need not address Plaintiff's other two arguments.

Page **16** of **20**

states that the SSA will find that a person has a medically determinable impairment of fibromyalgia if the physician diagnoses fibromyalgia, provides evidence satisfying the 1990 or 2010 American College of Rheumatology (ACR) criteria, and the diagnosis is not "inconsistent with the other evidence in the person's case record." *See* SSR 12-2p, at *2; *see also Paula K. v. Saul*, No. 1:20cv318, 2021 WL 2802575, at *5 (N.D. Ind. July 6, 2021).

In other words, in addition to a diagnosis of fibromyalgia, under Social Security Rule 12-2p, there are two routes by which Plaintiff can establish her condition as a medically determinable impairment. *See Thomas v. Colvin*, 826 F.3d 953, 959 (7th Cir. 2016)(citing SSR 12-2p, 2012 WL 3104869, at *2-3). The 1990 ACR criteria requires: (1) a history of widespread pain; (2) at least 11 out of a possible 18 tender points on the body; and (3) evidence that other disorders that could cause the symptoms or signs were excluded. *See* SSR 12-2p, 2012 WL 3104869, at *2-3. The 2010 ACR criteria requires: (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and (3) evidence that other disorders that could cause the symptoms or signs were excluded. *Id.* at *3. The major difference is that the former requires positive tender points, while the latter instead relies on "manifestations of six or more [fibromyalgia] symptoms." *See* Social Security

Ruling, SSR 12-2p, Titles II and XVI: Evaluation of Fibromyalgia, 77 Fed. Reg. 43640, 43641-42 (July 25, 2012)(hereinafter "SSR 12-2p"); *Thomas v. Colvin*, 826 F.3d 953, 959 (7th Cir. 2016).

Here, the ALJ specifically found:

> The record contains no objective medical evidence to substantiate the claimant's allegations that fibromyalgia is a medically determinable impairment. The record does not contain acceptable clinical or laboratory findings demonstrating the presence of fibromyalgia. The medical records mention that the claimant has greater than ten trigger points, but without specific reference to the location of those trigger points (9F/10; 15F/18). There are no other specific or objective findings to support the presence of this condition.

(Tr. 18).

A review of Plaintiff's medical records demonstrates a diagnosis of fibromyalgia, a history of widespread pain, testing to exclude other potential causes, and at least six symptoms commonly associated with fibromyalgia. In August 2018, during Plaintiff's first visit with Dr. Baak, Plaintiff reported fatigue, insomnia, and moderate joint pain in her lower back, bilateral MCP joints, bilateral PIP joints, and bilateral feet. (Tr. 311). During this visit, she was diagnosed with fibromyalgia, and Dr. Baak noted diffuse crackles of the lungs and greater than 10 trigger points. (Tr. 314, 315). Also, during this visit, Dr. Baak ordered the following tests: cardiolipin antibody panel, thyroid peroxidase antibody assay, immunoglobulin A measurement, rheumatoid factor, urinalysis, Hepatitis C antibody assay, ANA comprehensive reflex SNA/ENA, creatine kinase, CRP, sedimentation rate, and aldolase. (Tr. 315-316). Dr. Baak prescribed Tylenol 1000mg 3

times a day, Gabapentin 600-1200mg nightly, and Hydroxychloroquine 400 mg daily. (Tr. 316). Likewise, on May 9, 2019, during another appointment with Dr. Baak, Plaintiff reported the following issues: fatigue, muscle pains, headaches, insomnia, paresthesia, shortness of breath and memory problems. Each of these are listed as common symptoms of fibromyalgia in SSR 12-2p. (Tr. 603-607). Also, during this appointment, Dr. Baak's assessment of Plaintiff, *inter alia*, included fibromyalgia. (Tr. 606). Moreover, on January 21, 2020, Plaintiff had a thoracic spine x-ray because of ongoing back pain and fibromyalgia, and the x-ray revealed multilevel degenerative disc disease with loss of disc space height. (Tr. 591). The physical exam revealed tenderness in the bilateral wrists, reduced breath sounds in the base of the lungs, decreased sensation in the feet, tenderness in the thoracic and lumbar spine, poor concentration (unaware of current events), and greater than 10 positive trigger points. (Tr. 598-599). Thus, Dr. Baak ordered additional testing, ordered physical therapy, refilled prednisone for flairs, and prescribed Tramadol 500 mg for pain. (Tr. 599-600). Clearly, Plaintiff's complaints were present and mentioned throughout most if not all of her visits with Dr. Baak. These complaints were ongoing with little variation, despite various medications being prescribed throughout Plaintiff's medical treatment.

The ALJ's error requires remand. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (internal citation omitted). In summary, the ALJ

failed to provide a sufficient reason to support a crucial finding in her decision, *i.e.*, the Plaintiff's fibromyalgia was not a medically determinable impairment. Her brief rationale for this conclusion is lacking. Moreover, the ALJ's finding on this point is directly contradicted by evidence from the Plaintiff's medical records. On remand, the ALJ is directed to more thoroughly address the Plaintiff's alleged fibromyalgia, as well as all of the related evidence, in a manner consistent with this opinion.

This Memorandum & Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: August 26, 2022.**

Digitally signed by
Judge Sison 2
Date: 2022.08.26
13:38:14 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**